2015 UT App 208

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
SKYLER J. SHEPHERD,
Defendant and Appellant.

Opinion
No. 20130169-CA
Filed August 13, 2015

Second District Court, Ogden Department
The Honorable Ernest W. Jones
No. 121900387

Samuel P. Newton, Attorney for Appellant

Sean D. Reyes and Ryan D. Tenney, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
STEPHEN L. ROTH and MICHELE M. CHRISTIANSEN concurred.

ORME, Judge:

¶1     This case is one of several arising from the tragic death of a swimmer who was killed by a boat in Pineview Reservoir, near Ogden. Defendant Skyler J. Shepherd appeals from his convictions for reckless endangerment, a class A misdemeanor; obstruction of justice, a class A misdemeanor; and failure to render assistance at an accident, a class B misdemeanor. *See* Utah Code Ann. §§ 73-18-13, 73-18-21, 76-5-112, 76-8-306 (LexisNexis 2012). We affirm all three convictions.

BACKGROUND

¶2     On August 21, 2011, a man who lived near Pineview Reservoir was working in his yard when he heard "blood

curdling" screams. To him, it was clear that the person screaming "was in intense pain." The man ran to a knoll behind his house that overlooked the reservoir. He could see a boat stopped in the water and three men inside it, all of whom were standing up and looking over the side of the boat. He heard one of the occupants ask, "Hey, lady, are you okay?" Moments later, the boat sped off, and he could see someone in the water.

¶3     The man got into his own boat and rowed out to where he had seen the person in the water. He came upon a woman, the victim in this case, who faintly pleaded, "Help me, help me." The man positioned his boat near the victim and grabbed her hand, and she grabbed onto the boat. Because the man was in a small, aluminum rowboat, he could not pull her in without capsizing. Instead, he held her hand and called 911.

¶4     It had taken the man approximately five-and-a-half minutes to reach the victim. It took deputies another eleven minutes to arrive after the 911 call. The victim's right leg had been "almost totally severed," and by the time the deputies reached the victim, her "pupils were fixed, she was not breathing, she had no pulse." The victim had apparently been hit by the propeller of a boat, and she suffered massive injuries to her pelvis and legs. One injury to her right leg completely transected her femoral artery, and she bled to death.

¶5     Police began their investigation by preventing boats from leaving the reservoir and speaking with the occupants of each vehicle near the boat ramp. Officers spoke to Defendant, who said nothing about being in an accident or seeing the victim. A few days later, however, the police received information that Defendant's boat might have been the one that hit the victim. Detectives went to Defendant's home and spoke to him about the victim's death. Defendant said he had been boating that day but had not seen the victim and only knew what he had learned from the news. He specifically "denied that he had hit anything recently" with his boat.

¶6     A few days after detectives interviewed Defendant at his home, he called and asked to speak with them again. He was interviewed at the sheriff's office—this time with his attorney present. At this interview, Defendant changed his story significantly. He told detectives that on the day the victim died, he had been on the reservoir with a group of friends. When the group decided to take the boat for one last run, Defendant's friend was at the wheel. The friend suddenly swerved to avoid a swimmer, then began "freaking out" to the point that he could no longer drive, so Defendant took the wheel.

¶7     Defendant claimed that he drove the boat over to the victim. He claimed that the victim was using her arms and legs to keep herself afloat and that she told the men in the boat that she was okay, but she was angry with them for driving so close to her and told them to "get out of there." According to Defendant, he never heard the victim scream or ask for help; he saw no blood in the water; and it was not until he was at the boat ramp and heard that a swimmer had been hit that "the fear started to set in" and he wondered if his boat might have been involved.

¶8     The State charged Defendant with reckless endangerment, obstruction of justice, and failing to give assistance at the scene of an accident.[1] A jury convicted Defendant on all counts. Defendant appeals.

## ISSUES AND STANDARDS OF REVIEW

¶9     Defendant advances several claimed errors that he believes warrant reversal of his convictions. First, he argues that

---

1. Defendant was alternatively charged as an accomplice on each count. Because we affirm Defendant's convictions with regard to his actions as a principal, we need not explore the alternative theory of accomplice liability.

there was insufficient evidence to support his conviction for reckless endangerment.

> In considering [a] challenge to the sufficiency of the evidence, we review the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict. If, during our review, we find some evidence or inferences upon which findings of all the requisite elements of the crime can reasonably be made, we affirm.

*State v. Germonto*, 868 P.2d 50, 55 (Utah 1993) (internal citation omitted).

¶10 Next, Defendant argues that evidence related to his initial failure to talk to police was improperly admitted in violation of his Fifth Amendment right to remain silent. We review the resolution of constitutional issues for correctness. *State v. Gallup*, 2011 UT App 422, ¶ 12, 267 P.3d 289.

¶11 The third issue raised on appeal is whether the trial court erroneously allowed the testimony of a boating expert whose opinion primarily focused on how sound travels over water. "'The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard. Under this standard, we will not reverse [a decision to admit or exclude expert testimony] unless the decision exceeds the limits of reasonability.'" *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794 (alteration in original) (quoting *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993)).

¶12 Somewhat relatedly, Defendant argues that the trial court improperly allowed witnesses to present "ultimate issue" testimony and opinions regarding Defendant's truthfulness. The State concedes that some of this testimony was improper but "even obvious error by the district court will not result in the reversal of a criminal conviction unless the error was prejudicial,

i.e., unless it created 'a sufficiently high likelihood of a different result such that our confidence in the outcome is undermined.'" *State v. Bragg*, 2013 UT App 282, ¶ 32, 317 P.3d 452 (quoting *State v. Adams*, 2000 UT 42, ¶ 20, 5 P.3d 642).

¶13　Finally, we are asked to determine whether Defendant's trial counsel rendered constitutionally ineffective assistance by failing to object to what Defendant characterizes as "multiple instances of prosecutorial misconduct." "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

ANALYSIS

¶14　We acknowledge at the outset that Defendant, in his brief, provides an explanation that puts his actions in a much more innocent light than the version of events apparently accepted by the jury. But when arguments on appeal touch on the sufficiency of evidence or the interpretation of it, we review that evidence not in the way Defendant spins it but in the light most favorable to the jury's verdict. *See, e.g.*, *State v. Bergwerff*, 777 P.2d 510, 511 (Utah Ct. App. 1989).

> It is the jury's prerogative to weigh the evidence, infer the material facts from it, and apply the law stated in the jury instructions to the facts. In order to preserve this prerogative, we review the evidence in the light most favorable to the verdict, and do not overturn a jury's verdict of criminal conviction unless reasonable minds could not rationally have arrived at a verdict of guilty beyond a reasonable doubt based on the law and on the evidence presented.

*Id.* (footnote omitted).

I. Sufficiency of the Evidence

¶15    In claiming that the evidence was insufficient to convict him of reckless endangerment, Defendant argues that he did not create the risk that the victim would die because he was not driving the boat when the victim was hit.[2] The State contends that Defendant created the risk not by striking the victim with his boat but because he made the "decision to drive the boat away, rather than stopping and giving aid to" the victim as required by law. We agree with the State.

¶16    The relevant statute criminalizes "recklessly engag[ing] in conduct that creates a substantial risk of death or serious bodily injury to another person." Utah Code Ann. § 76-5-112 (LexisNexis 2012). We have previously considered this statute and explained that "[r]eckless in this context requires a showing that the defendant was 'aware of but consciously disregard[ed] a substantial and unjustifiable risk.'" *State v. Carter*, 2005 UT App 232U, para. 3 (per curiam) (second alteration in original) (quoting Utah Code Ann. § 76-2-103(3) (LexisNexis 2003)). We

_____

2. At least for purposes of this appeal, Defendant does not contest that his boat struck the victim and that the victim ultimately died as a result of those injuries. He acknowledges that there was evidence presented to the jury that could support findings (1) that Defendant's friend struck the victim with the boat, "severing her femoral artery and causing severe damage to her lower body"; (2) that Defendant drove the boat over to the victim, "asked if she was ok, [and] saw that she was severely injured"; (3) that he then "left the scene of the accident"; and (4) that the victim "had a slight chance of living had [Defendant] rendered emergency care." The evidentiary insufficiency, Defendant claims, "lies in the fact that [Defendant's] behavior was not the proximate cause of [the victim's] death under the statute and did not create the substantial risk of death."

agree with courts of other jurisdictions that have considered analogous cases and concluded "that the conduct proscribed by the reckless endangerment statute includes the wilful failure to perform a legal duty." *See, e.g.*, *State v. Kanavy*, 4 A.3d 991, 996 (Md. 2010).[3] Thus, the evidence was sufficient to convict

---

3. In *State v. Kanavy*, 4 A.3d 991 (Md. 2010), the Court of Appeals of Maryland decided that reckless endangerment could include the failure to act in certain situations. *Id.* at 996. It found support for this conclusion from several authorities. *Id.* at 996–97. *See People v. Sanford*, 808 N.Y.S.2d 274, 275 (App. Div. 2005) (reversing the dismissal of a multi-count indictment that was based in part on the defendant's failure to render or summon aid); *State v. Nelson*, 198 P.3d 439, 442 (Or. Ct. App. 2008) ("[T]o obtain a conviction under the reckless endangerment statute, the state generally has to prove, first, that the defendant performed an act, or omitted to perform an act as required by law[.]"); Model Penal Code § 1.13(5) (2001) (defining "conduct" as "an action or omission and its accompanying state of mind, or, where relevant, a series of acts and omissions"); Black's Law Dictionary 292 (7th ed. 1999) (defining "conduct" as "[p]ersonal behavior, whether by action or inaction"). We note that Maryland, New York, and Oregon have reckless endangerment statutes very similar to Utah's. *Compare* Md. Code Ann., Crim. Law § 3-204 (West 2015) ("A person may not recklessly: (1) engage in conduct that creates a substantial risk of death or serious physical injury to another[.]"), N.Y. Penal Law § 120.20 (McKinney 2015) ("A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."), *and* Or. Rev. Stat. Ann. § 163.195 (West 2015) ("A person commits the crime of recklessly endangering another person if the person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."), *with* Utah Code Ann. § 76-5-112 (LexisNexis 2012) ("A person commits reckless endangerment if, under circumstances not

(continued…)

Defendant of reckless endangerment if Defendant owed the victim a legal duty to act and the jury could reasonably have found that (1) he was aware of the substantial risk of death or serious bodily injury to the victim should he fail to act and (2) he consciously disregarded that risk by failing to act. We first consider whether Defendant owed the victim a duty to act.

¶17 The State suggests, and we accept for purposes of this appeal, that a passing, uninvolved boater might not be guilty of reckless endangerment. But "[i]t is the duty of the operator of a vessel involved in an accident . . . to render aid to those affected by the accident as may be practicable." Utah Code Ann. § 73-18-13(2)(a) (LexisNexis 2012). The State rightly points out that "by its plain language, this statutory duty is notably not restricted to the person who was driving at the time of the accident," but rather the focus is on a vessel's involvement in an accident. Thus, as soon as Defendant became the operator of the boat, the boat having been involved in an accident, he bore a duty to render aid to the victim.

¶18 We next consider whether the jury could have properly found that Defendant was aware of the risk posed by his failure to render aid. *See* Utah Code Ann. § 76-5-112. Defendant concedes that there was evidence from which the jury could have found that he was aware of the victim's injuries. *See supra* note 2. What we must determine, then, is whether the jury also could reasonably have found that Defendant's decision not to help the victim presented a substantial risk that those injuries would culminate in her death or serious bodily injury, which he consciously disregarded.

---

(…continued)
amounting to a felony offense, the person recklessly engages in conduct that creates a substantial risk of death or serious bodily injury to another person.").

¶19   According to the man who called 911, the victim was alive and responsive when he reached her, which was more than five minutes after Defendant's boat struck her. He immediately called 911, and help arrived approximately eleven minutes later. Specifically, from the testimony given at trial, the jury could have found that the victim was hit by the boat at 8:08 pm; the man reached the victim at 8:14 pm, at which point the victim was upright and treading water with her arms; the victim was still moving at 8:17 pm; her mouth was moving at 8:24 pm; and emergency responders arrived at 8:25 pm, at which point the victim had died.

¶20   The jury also could reasonably have found that within that same time frame, if Defendant had promptly rendered aid as he had a duty to do, the victim could have survived. Evidence on this point included testimony that if Defendant had rendered aid by bringing the victim aboard his boat and lying her down, her blood loss would have slowed and she likely would have survived long enough to receive first aid from firefighters on a nearby beach had Defendant driven the boat there. And if Defendant had done nothing more than call 911 immediately after the collision, "life flight" could have been dispatched and the victim could have gotten to the nearest hospital by 8:24 pm— the time at which the victim was still alive and her mouth was still moving even though she had remained vertical, a position which, according to one expert, maximized her blood loss, and even though she was not receiving medical care, as she would have while being transported on life flight.

¶21   Thus, Defendant could have given the victim a chance to survive simply by calling 911 or providing even the most rudimentary first aid—like getting the victim out of the water and into a horizontal position. And while his decision not to render aid did not guarantee her death, the jury could have easily found on the evidence before it that this decision posed a substantial risk that the victim would die, much less that she would sustain serious bodily injury. It follows that Defendant's

conviction of reckless endangerment is supported by legally sufficient evidence.

## II. Defendant's Right to Remain Silent

¶22    Defendant also argues that the trial court erroneously allowed the State to use Defendant's initial silence as a basis from which the jury could infer his guilt. His argument is unavailing.

¶23    To begin with, we are not persuaded that Defendant ever invoked his right to remain silent. The United States Supreme Court has explained "that a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must *assert* the privilege rather than answer if he desires not to incriminate himself." *Minnesota v. Murphy*, 465 U.S. 420, 429 (1984) (emphasis added). "The privilege 'is deemed waived unless invoked.'" *Rogers v. United States*, 340 U.S. 367, 371 (1951) (quoting *United States v. Murdock*, 284 U.S. 141, 148 (1931)). *See also Salinas v. Texas*, 133 S. Ct. 2174, 2184 (2013) (plurality opinion) ("Before petitioner could rely on the privilege against self-incrimination, he was required to invoke it.").

¶24    Defendant spoke with law enforcement on three separate occasions regarding the incident at issue and, while his story evolved from one occasion to the next, he never asserted his constitutional right not to answer the detectives' questions. He did, however, selectively provide detectives with false information and half-truths. A defendant may not provide law enforcement with a version of a story that benefits him and then later claim that the Fifth Amendment protects falsities included therein or pertinent information he chose to leave out.[4] *Cf. United*

---

4. Of course, this does not preclude individuals from deciding to invoke their right to remain silent after they have already started answering questions. *See Miranda v. Arizona*, 384 U.S. 436, 473–74

(continued…)

*States v. Wong*, 431 U.S. 174, 178 (1977) ("[T]he Fifth Amendment privilege does not condone perjury. It grants a privilege to remain silent without risking contempt, but it 'does not endow the person who testifies with a license to commit perjury.'") (quoting *Glickstein v. United States*, 222 U.S. 139, 142 (1911)). Defendant does not attempt to explain when or how he invoked his Fifth Amendment right to remain silent, and the record does not support a conclusion that Defendant ever invoked this privilege.

¶25 But even if we were to assume that something in the course of Defendant's conversations with police could be construed as an invocation of his right to remain silent, the result would be the same. To the extent that any comment on what Defendant did not say was improper, it was nevertheless harmless beyond a reasonable doubt. *See generally State v. Maas*, 1999 UT App 325, ¶ 14, 991 P.2d 1108 ("[W]hen a [constitutional] violation has occurred, the State bears the burden of demonstrating that the improperly elicited testimony was harmless beyond a reasonable doubt.") (citation and internal quotation marks omitted).

¶26 The first comment of which Defendant complains came about during the State's case-in-chief. The State asked its witness, an officer involved in the investigation, whether Defendant had offered him any information about the accident, either at the scene or in a subsequent interview. The officer testified that Defendant offered no pertinent information.

¶27 Defendant also argues that the State, during its closing argument, improperly commented on his silence. The closing

---

(…continued)
(1966) ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). But that is not what happened here.

argument addressed Defendant's failure to speak up at the boat ramp and general failure to "come forward."

¶28    To determine whether an error is harmless beyond a reasonable doubt, we consider the importance of the complained-of evidence to the prosecution's case, whether that evidence was cumulative, and the overall strength of the prosecution's case. *State v. Gallegos*, 967 P.2d 973, 980–81 (Utah Ct. App. 1998). The testimony indicating that Defendant initially failed to provide detectives with information about what had happened at the reservoir, and the State's reminder of this fact in argument, was not greatly important and likely did little to convince the jury of Defendant's guilt. The jury had before it Defendant's own admission that he had seen the victim in the water after his friend swerved the boat and began "freaking out." There was also the testimony from the man who heard the victim's screams and immediately looked out to see Defendant's boat near the victim before it sped away.[5] Even if we were to conclude that the trial court erred by allowing comments on Defendant's theorized invocation of his right to remain silent, with this sort of evidence before the jury, any such error was harmless beyond a reasonable doubt.

### III. Opinion Testimony

¶29    Defendant asserts that the trial court erred in allowing certain opinion testimony at trial. First, he contends that the trial court should have excluded testimony from the State's expert witness because the testimony violated rule 702 of the Utah

---

5. Defendant makes much of the fact that the man said he saw a white boat with a blue stripe, while Defendant's boat is white with a green stripe. When the man was later shown Defendant's boat, he indicated that it was the boat he had seen near the victim. He said it still looked blue to him. One detective who worked on the case explained that although the stripe was green, it looked blue in certain light.

Rules of Evidence. Next, he argues that the State's witnesses were erroneously permitted to offer opinions on an ultimate issue in the case. Finally, Defendant claims that his convictions should be reversed because several of the State's witnesses testified as to their opinion of Defendant's truthfulness. We consider each alleged error below.

A.     Expert Witness

¶30     We will first consider Defendant's argument that the trial court erred in allowing the testimony of the State's boating expert.[6] The State called its boating expert mainly to testify about

---

6. The briefs of both sides suggest some confusion about the applicable rules governing expert testimony. An objection to such testimony, or an appeal alleging error in the admission of the same, should be couched in terms of rule 702 of the Utah Rules of Evidence. *See* R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 569 (2014–15 ed.) ("To preserve an issue on appeal for expert testimony, an objection of 'speculative', hearsay, or lack of foundation will not preserve an objection for lack of qualification.") (footnote omitted). In his brief, Defendant argues broadly that the boating expert's testimony "failed to meet Rule 702's requirements for expert testimony." His specific arguments are that the boating expert (1) "was not an expert, but he made expert-like conclusions which were improperly admitted"; (2) "did not have the proper experience to make the claims he asserted"; and (3) "did not follow the scientific method in his analysis." The first of these arguments is actually an assertion that the witness offered improper lay opinion under rule 701 of the Utah Rules of Evidence. Because no 701 objection was made to the trial court, that objection is not a proper ground for appeal. *See State v. Olsen*, 860 P.2d 332, 335 (Utah 1993) ("As we have repeatedly held, failure to object constitutes waiver of the objection."). The second argument appears to be a challenge to the expert's

(continued…)

(…continued)

qualifications, *see* Utah R. Evid. 702(a), but we readily conclude that the trial court acted within its discretion in accepting this particular witness as a boating expert, given his qualifications, *see infra* ¶ 33. Furthermore, at trial, Defendant's counsel admitted, "I don't dispute he has a lot of experience with boats." His final argument, that the boating expert failed to follow the scientific method, appears to be a challenge to application. *See* Utah R. Evid. 702(b)(3) ("Scientific, technical, or other specialized knowledge may serve as the basis for expert testimony only if there is a threshold showing that the principles or methods that are underlying in the testimony . . . have been reliably applied to the facts."). While Defendant did not specifically object on application grounds during the course of the boating expert's testimony, he did lodge a general objection to the witness's testimony before the witness took the stand. The content of that objection further supports a conclusion that Defendant's real problem with the boating expert constitutes a challenge under rule 702(b)(3). Defendant's counsel argued:

> [T]he problem is when I talk to [the boating expert,] he never tested [Defendant]'s boat, and he's never been in the Pineview area. I think it's going to mislead the jury to say, "Well, just because I can hear things in my boat," nobody tested the noise level of [Defendant]'s engine.
>
> So I think there's a real problem here with this expert.

Having waded through the record and Defendant's arguments and concluded that the crux of the 702 challenge concerns application, we could elect to confine our analysis to this point. But because we believe that the parties and other readers of this opinion might benefit from an explanation of rule 702 and the proper flow of analysis under it, our opinion also briefly explores the foundational aspects of expert testimony other than application.

"how sound travels over water." He also testified about his experiences when hitting items in the water, particularly what can be felt, heard, and seen in such situations. "'The trial court has wide discretion in determining the admissibility of expert testimony,'" and we will reverse a trial court's ruling on the admissibility of expert testimony "only when it 'exceeds the limits of reasonability.'" *Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶ 16, 269 P.3d 980 (quoting *Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶ 5, 242 P.3d 762).

¶31 The trial court could properly admit the boating expert's testimony if the court reasonably determined (1) that scientific, technical, or other specialized knowledge would assist the jury to understand the evidence or determine a fact in issue; (2) that the witness was qualified as an expert by knowledge, skill, experience, training, or education; and (3) that the State made a threshold showing that the principles or methods underlying the testimony were reliable, were based on sufficient facts or data, and had been reliably applied to the facts of this case. *See* Utah R. Evid. 702. *See also* R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 543–45 (2014–15 ed.).

¶32 Part of the jury's role was to make determinations regarding Defendant's subjective knowledge. Specifically, it had to decide whether Defendant was aware of and consciously disregarded a substantial risk to the victim. *See supra* ¶ 16. It was therefore reasonable for the trial court to decide that it would be helpful for the jury to hear expert testimony regarding what could have been heard and felt on the water. Thus the preliminary requirement of rule 702—that expert testimony must be helpful to the finder of fact—was met. *See* Utah R. Evid. 702(a). *See also State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993) ("Under rule 702, the question that must be posed prior to the admission of any expert evidence is whether, 'on balance, the evidence will be helpful to the finder of fact.'") (quoting *State v. Rimmasch*, 775 P.2d 388, 398 n.8 (Utah 1989)).

¶33　The trial court likewise could have reasonably concluded that the boating expert was qualified by his knowledge, experience, or training. His qualifications included time in the Coast Guard, more than ten years as a boating officer at Lake Powell, more than ten years as the boating director for the state park system, and more than 20,000 hours spent on the water. Utah courts "have routinely allowed persons to testify as experts based on the totality of their qualifications and experience, and not on licensing or formal standards alone." *State v. Kelley*, 2000 UT 41, ¶ 15, 1 P.3d 546. Given the nature and extent of the witness's experience with boating, it was within the trial court's discretion to consider the witness a boating expert.

¶34　All that is left to consider, then, is whether the State made the requisite threshold showing under rule 702(b). The first inquiry under rule 702(b) is whether the principles or methods used by the expert were reliable. *State v. Turner*, 2012 UT App 189, ¶ 21, 283 P.3d 527. The boating expert offered experiential opinions, meaning he "did not need to identify a particular methodology." *See id*. *See also United States v. Bynum*, 604 F.3d 161, 167 (4th Cir. 2010) (explaining that "although '[e]xperiential expert testimony . . . does not rely on anything like a scientific method,' such testimony is admissible under Rule 702 so long as an experiential witness 'explain[s] how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts'") (alterations and omission in original) (quoting *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)).

¶35　In the present case, the boating expert testified about the training he had received on boat accident investigation, the opportunity he had to assist scientists in conducting a test on the noise emitted by boats, his personal experiences operating boats like the kind Defendant owned, and his own observations when hitting objects in the water. It is entirely reasonable to conclude that these sorts of experiences were sufficient under

rule 702(b)(1) for the boating expert to offer opinions within the scope of his experience.

¶36   Next, under rule 702(b)(2), we consider whether the boating expert based his opinion on sufficient facts or data. *See* Utah R. Evid. 702(b)(2). Under the facts of this case, some of the same details that demonstrate the reliability of the boating expert's methods also show that his opinion was based on sufficient facts. He had experience driving boats similar to Defendant's. He spent over a decade working on Lake Powell, which gave him extensive experience on the water. He reviewed specifics from this case in the form of police reports, the statement of Defendant, and photographs of Defendant's boat, including the motor and the operating system. Thus, the expert's testimony met the threshold requirement of rule 702(b)(2).

¶37   Finally, we look to rule 702(b)(3) and consider whether the boating expert's methods were reliably applied to the facts of this case. *See* Utah R. Evid. 702(b)(3). We reiterate that the State was only required to make a threshold showing on this point. "Contrary and inconsistent opinions may simultaneously meet the threshold; it is for the factfinder to reconcile—or choose between—the different opinions." *Id.* R. 702 advisory committee note. Defendant's argument that the boating expert "was incorrect about a number of factors" is therefore insufficient to convince us that the threshold was not met.

¶38   Defendant also alleges that the boating expert "did not follow the scientific method." We repeat that a scientific methodology is unnecessary for experiential opinions. *See supra* ¶ 34. But we understand the particulars of Defendant's argument to speak more to application. Defendant points to the facts that the expert did not personally test or examine Defendant's boat or visit Pineview Reservoir. But as we explained above, the boating expert had access to and made use of specific information regarding Defendant's boat and the reservoir. "The opinion of an expert is not rendered inadmissible because it may be based upon facts proved by the observations

of others." *Universal Inv. Co. v. Carpets, Inc.*, 400 P.2d 564, 567 (Utah 1965). The boating expert's election to rely on facts established by the State's investigation therefore does not render his opinion legally inadequate under rule 702(b)(3).

¶39 One specific incident recounted by the boating expert is referenced repeatedly in Defendant's brief. As part of his testimony regarding what an individual might feel, hear, and see when he hits an object with a boat, the boating expert related a story from when he was in the Coast Guard and his boat struck a harbor seal. He explained that he "felt it on the steering wheel slightly, heard it go underneath the boat, [and saw a] red spot in the water." At trial, Defendant objected on relevance grounds, his counsel rhetorically asking, "How can you compare a seal to a person?" Even overlooking the fact that Defendant now attempts to use this relevance objection as one predicated on rule 702, we conclude that this is the sort of "concern[] best reserved for the weight of the evidence rather than its threshold reliability for purposes of admissibility." *See Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶ 45, 269 P.3d 980. Of course there are differences between seals and humans, but it would be illogical to conclude that only those individuals who have hit a human with their boat could properly provide expert opinion in this case as to the physical manifestations of striking an unseen object in the water. Instead, the boating expert used his experience of hitting a large, living thing to draw an analogy to the instant case. Any weaknesses in that analogy could be—and were—attacked on cross-examination and highlighted in closing argument, but an adequate threshold showing was nonetheless made under rule 702(b)(3).

¶40 The boating expert's testimony was likely to help the jury, and the expert exhibited the requisite qualifications to be considered an expert under rule 702 of the Utah Rules of Evidence. Furthermore, the State properly made a threshold showing of the reliability of the boating expert's methods, the adequacy of the information relied upon, and the reliability of

the application of his methods to the particular facts of this case. Because all elements of rule 702 were met, there was no error in the trial court's allowing the testimony of the boating expert.

B.      Ultimate Issue Testimony

¶41    Defendant argues that it was error for the trial court to allow the boating expert and a detective, both witnesses for the State, to testify that Defendant would have heard the victim's screams above the roar of the boat's engine. We agree with the State that this argument fails because "the testimony at issue concerned the ability of a person to hear sounds or see sights while on the water [and] was not an 'ultimate issue' for purposes of the relevant rule."

¶42    An ultimate issue is one that the jury is asked to decide. *See State v. Larsen*, 828 P.2d 487, 493 n.7 (Utah Ct. App. 1992), *aff'd*, 865 P.2d 1355 (Utah 1993). In the instant case, that would include issues such as whether Defendant acted recklessly or created a substantial risk of death or serious bodily injury. *See* Utah Code Ann. § 76-5-112 (LexisNexis 2012). The jury was not, however, asked to decide whether Defendant heard the victim's screams; rather, that was a question of fact that the jury might have considered in reaching one or more ultimate conclusions. Therefore, we need not analyze whether such testimony was properly admitted under rule 704 of the Utah Rules of Evidence, because this is simply not the sort of testimony that is governed by that rule. *See* Utah R. Evid. 704.

C.      Testimony Regarding Truthfulness

¶43    The next issue concerns two of the State's witnesses, who testified that they did not believe that Defendant was telling the truth when he insisted that he neither heard the victim scream nor saw the victim's injuries. The State concedes that this testimony violated the rule that "a witness may 'not offer a direct opinion' of another['s] truthfulness on a particular occasion." *See State v. King*, 2010 UT App 396, ¶ 44, 248 P.3d 984

(quoting *State v. Adams*, 2000 UT 42, ¶ 13, 5 P.3d 642). *See also* Utah R. Evid. 608. But the State's concession only establishes error; we must also consider whether the improper testimony was prejudicial. *See State v. Stefaniak*, 900 P.2d 1094, 1096 (Utah Ct. App. 1995) ("Having determined that the court erred in admitting the testimony bolstering the victim's credibility, we must separately determine whether the error was prejudicial in this case."). If we conclude that absent this testimony there is a reasonable likelihood that the jury would have returned a verdict more favorable to Defendant, we must reverse. *Id.*

¶44    In *Stefaniak*, we determined that allowing testimony that bolstered the victim's credibility was reversible error because "[t]he State's case against Stefaniak hinged entirely on the credibility of the victim." *Id.* In contrast, the present case relied very little, if at all, on the challenged testimony. That testimony established that two of the State's witnesses did not believe Defendant when he said that he did not hear the victim scream or see evidence of the victim's injuries. Absent that testimony, the jury would still have had before it the testimony of the man who called 911, who was first alerted to the problem in the water when he heard the victim's screams from several hundred feet away. There were also officers who testified about their involvement with a reenactment of the accident; they said that they could easily hear screams over the noise of the boat. A medical doctor testified that the victim would have been "bleeding extensively," given her injuries, and that the blood would have necessarily been visible in the water. The jury also had the opportunity to view a photograph of the victim, which showed her extensive injuries, and jurors could have formed their own conclusions regarding what Defendant would have been able to see and hear.

¶45    We are not convinced that the testimony regarding Defendant's truthfulness mattered much. The jury had before it ample other evidence that called into question Defendant's credibility, in particular his inconsistent accounts early in the

police investigation of this case. *See supra* ¶¶ 5–7. With or without the testimony regarding Defendant's truthfulness, the jury would have come to the same conclusion, and the outcome would have been no better for Defendant. The admission of this testimony therefore constitutes harmless error.

### IV. Prosecutorial Misstatements and Ineffective Assistance

¶46 Finally, Defendant argues that his trial counsel should have objected to "several objectionable statements" made by the prosecutor during his closing argument. He claims that the decision not to object rendered his trial counsel's performance constitutionally deficient. To succeed on this claim, Defendant must establish that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).

¶47 The Utah Supreme Court recently considered a similar claim and clarified that "[w]hen we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is 'not whether the prosecutor's comments were proper, but *whether they were so improper* that counsel's only defensible choice was to interrupt those comments with an objection.'" *State v. Houston*, 2015 UT 40, ¶ 76 (emphasis in original) (quoting *Bussard v. Lockhart*, 32 F.3d 322, 324 (8th Cir. 1994)). We agree with the State that the complained-of comments were "largely benign" and were not so improper as to warrant reversal for trial counsel's failure to object to them.

### A. Statements on Credibility and Personal Opinion

¶48 Defendant's first complaint about the prosecutor concerns his statements about the credibility of witnesses and the interjection of his personal opinions. During his closing argument, the prosecutor asserted that some of Defendant's

statements were untrue and that he did not personally believe Defendant's version of events.[7]

¶49 Our view of the prosecutor's statements regarding Defendant's truthfulness is in line with our previous discussion of the improper testimony that was admitted regarding whether Defendant was telling the truth on a particular occasion. *See supra* ¶¶ 43–45. We determined that the credibility testimony was harmless because of the extent of the other evidence properly before the jury and because Defendant's inconsistent accounts, which were known to the jury, were enough to call his credibility into question. Similarly, we conclude that not objecting to these portions of the State's closing argument did not prejudice Defendant. The decision not to object therefore did not render trial counsel's performance constitutionally ineffective. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232 ("In the event it is 'easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,' we will do so without analyzing whether counsel's performance was

---

7. Defendant points to "seven instances of the prosecutor's use of the personal pronoun 'I' coupled with assertions [of] the credibility [or] believability of a witness." First, after posing the question of whether Defendant had a motive to testify untruthfully, the prosecutor stated, "I'd submit that he does." The prosecutor stopped short of actually offering an opinion on Defendant's truthfulness, and we see no error in this statement. The second and third statements involved the prosecutor saying "I think" that certain things Defendant said were truthful. It is unclear how the prosecutor opining that Defendant was *truthful* could have prejudiced Defendant. This leaves four statements for our consideration. Three times the prosecutor asserted that something Defendant had said was "not a truthful statement." He also said, regarding Defendant's version of events, "I don't believe that. That isn't what happened."

professionally unreasonable.") (quoting *Strickland*, 466 U.S. at 697).

¶50  We now turn to trial counsel's decision not to object to the prosecutor's personalization in his closing argument. This will not be considered deficient performance if "there were conceivable tactical bases" for not objecting. *See State v. Bryant*, 965 P.2d 539, 543 (Utah Ct. App. 1998).

¶51  To begin with, our prior decisions have recognized that even when a prosecutor makes improper statements during closing argument, a defense attorney might forgo objecting so as to avoid "emphasiz[ing] the negative aspects of the case to the jury." *West Valley City v. Rislow*, 736 P.2d 637, 638 (Utah Ct. App. 1987). That could very well have been the case here. The prosecutor's statement was rather innocuous; he essentially anticipated opposing counsel's closing argument by indicating, "[Defendant's counsel] wants to say, 'Oh, [the victim] was in shock. She said she was okay. It was okay for them to go.'" The prosecutor followed up with, "I don't believe that. That isn't what happened."

¶52  In his closing argument, Defendant's trial counsel did exactly what the prosecutor previewed. He talked about the effects of going into shock and why Defendant might have believed it was okay to leave the victim. There are several possible tactical reasons for defense counsel's decision not to object, one of which is that counsel might not have wanted to highlight the State's attempts to discredit his closing argument before he had a chance to make it. Another is that objecting might suggest to the jury that it is a troublesome point—one worth objecting to—while letting it go demonstrated counsel's confidence in the jury's ability to distinguish between evidence and argument, a subject covered in the jury instructions.

¶53  Additionally, Defendant's trial counsel may well have had no interest in promoting ground rules that would foreclose personalization during closing argument. His own closing

argument was very personal, including a story about himself and a request that the jurors envision themselves in Defendant's situation. Trial counsel could have decided that objecting to the more personal aspects of the State's closing argument might have increased the likelihood that the State would successfully object to the personal aspects of his own closing argument.

B.      Reference to Plea Negotiations

¶54    Next, Defendant takes issue with the prosecutor's references to pretrial plea negotiations because "no evidence was presented on [this] topic." Defendant argues that these references encouraged the jury to consider matters not in evidence. *See State v. Bakalov*, 1999 UT 45, ¶ 59, 979 P.2d 799. But contrary to Defendant's claim, there was evidence presented on this point, and it was evidence Defendant insisted that the jury hear.

¶55    During the testimony of one of the State's witnesses, the jury saw video of a police interview with Defendant. On cross-examination, Defendant's trial counsel said that the State had "cut off the first couple of minutes" of the video and indicated that he would "like them to see the whole thing." The jury then watched the beginning of the video, which included negotiations regarding Defendant's willingness to cooperate with the police in exchange for the State not bringing other charges against him.

¶56    Defendant opened the door through which the evidence he now challenges entered by bringing in evidence of the negotiations,[8] and the prosecutor was therefore within his rights

---

8. Opening the way to the introduction of evidence of the plea negotiations was not itself ineffective assistance by defense counsel. Counsel may well have considered that this evidence would suggest that the State knew its case was not all that strong or that Defendant's role was comparatively minor, warranting not bringing certain charges.

to comment on that evidence during his closing argument. Against this background, there was nothing improper about these references, and any objection by Defendant's trial counsel would have been futile. Accordingly, this failure to object does not constitute deficient performance. *See Codianna v. Morris*, 660 P.2d 1101, 1109 (Utah 1983) ("[T]he failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance.") (citation and internal quotation marks omitted).

C. Reference to Charging Decisions

¶57 Defendant next argues that the prosecutor engaged in misconduct when he indicated in his closing argument that "[w]hen you look at this case you may think, you know, maybe there should be more serious charges on these guys than misdemeanor." We assume without deciding that this statement constituted misconduct and focus our analysis on whether the statement prejudiced Defendant. *See State v. King*, 2010 UT App 396, ¶ 22, 248 P.3d 984 (explaining that "a prosecutor's statement during closing argument that prompts the jury to consider matters outside the evidence constitutes prosecutorial misconduct").

¶58 We acknowledge that in some close cases, a statement like this could prejudice the defendant. But this was not a close case. There was Defendant's own admission that his boat had been near the victim and that he had seen her in the water. There was testimony from an eyewitness who heard the victim's screams and was able to identify Defendant's boat as the only one near the victim when she screamed. There was medical and expert testimony that shed light on what Defendant likely heard and saw when his boat was near the victim.

¶59 Given the evidence presented to the jury, it is entirely possible that the prosecutor actually risked making the jurors angry with him by reminding them that he had only charged Defendant with misdemeanors. It is unlikely, though, that this

reminder negatively impacted the jury's treatment of Defendant, as the evidence overwhelmingly supported a guilty verdict on the charged counts. Because there was no prejudice to Defendant, the decision not to object to this statement does not constitute ineffective assistance.

D.     Jury's Role

¶60     Finally, Defendant argues that the prosecutor, in his closing argument, improperly "vouched for specific jurors' role[s]." The prosecutor told the jurors:

> Again, just remember reasonable doubt has to be based on reason. You were picked for this jury because I believe you all have common sense. . . . I asked you in voir dire if we were able to prove our case beyond a reasonable doubt could you all return a guilty verdict. You all indicated that you could. I'm asking you to do that now.

Defendant provides us no explanation as to how the authority he cites supports a conclusion that this statement was improper. He does cite *State v. Thompson*, 2014 UT App 14, 318 P.3d 1221, for the proposition that prosecutors may not ask a jury to render a verdict based on its societal obligation or the impact the verdict might have on society. *See id.* ¶ 67. While this is a correct proposition, it has no bearing here.

¶61     The prosecutor did not demand that the jury return a guilty verdict. He did not reference the jurors' obligations as members of society. He instead expressed a self-evident truth, that jurors are allowed to employ their common sense during deliberation, and he reminded them of something explained in their instructions, that a reasonable doubt is based on reason. Because we cannot see how this statement was improper, we cannot conclude that Defendant's trial counsel had any reason to object to it.

CONCLUSION

¶62    All of Defendant's arguments on appeal are without merit. There was sufficient evidence to support his conviction for reckless endangerment because he owed the victim a legal duty to render aid and he opted not to fulfill that duty. In so doing, he consciously disregarded a substantial risk that the victim would die or at least sustain serious bodily injury. This sufficient evidence largely resolves almost every other issue before us, because even if there were errors in the admission of particular bits of evidence, those errors did not prejudice Defendant.

¶63    The State did not improperly comment on Defendant's silence, because Defendant never invoked his Fifth Amendment rights. Even if he did, the error was harmless. The trial court did not abuse its discretion in admitting expert testimony. The trial court did not allow any inadmissible ultimate-issue opinions. The introduction of improper evidence regarding credibility was harmless. And Defendant's trial counsel was not ineffective for choosing not to object to the State's closing argument.

¶64    Affirmed.

———————