**2025 UT App 120**

### THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MICHAEL TIMOTHY MCDANIEL,
Appellant.

Opinion
No. 20230525-CA
Filed August 7, 2025

Third District Court, West Jordan Department
The Honorable William K. Kendall
No. 181403959

Nathalie S. Skibine, Attorney for Appellant

Derek E. Brown and Mark C. Field,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

TENNEY, Judge:

¶1 A jury convicted Michael McDaniel of two counts of sodomy on a child and one count of aggravated sexual abuse of a child. McDaniel now challenges his convictions on four grounds:

- First, McDaniel argues that the district court should have granted his request for a directed verdict, either at the close of the State's case or at the close of the defense's case.

- Second, McDaniel argues that the State's expert should not have been allowed to testify because he was not qualified and his testimony was not reliable.

- Third, McDaniel argues that his counsel provided ineffective assistance when he advised McDaniel to appear in jail clothes at trial and then commented on those jail clothes when addressing the jury.

- Finally, McDaniel argues that the district court erred by giving an "indecent liberties" instruction that was not supported by the law in effect at the time of McDaniel's alleged criminal conduct.

¶2 For the reasons set forth below, McDaniel has not persuaded us that there was any reversible error. We accordingly affirm his convictions.

## BACKGROUND[1]

*Allegations, CJC Interview, and Police Interview*

¶3 In December 2013, when Kimberly[2] was three years old, she and her family moved into a one-bedroom apartment with "really long stairs" in West Jordan. During the time that Kimberly's family lived there, "people" were "always in and out" because Kimberly's parents were using and selling methamphetamine.

¶4 McDaniel "stayed with" the family "on and off" between December 2013 and February 2014. Kimberly's mother (Mother) would leave Kimberly and her brother with McDaniel "[a]t least four times a week" for "up to eight" hours so that she and

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified).

2. A pseudonym.

Kimberly's father (Father) could "run around and collect money." On one occasion in January 2014, Mother left McDaniel alone with the children for "[a]lmost 48 hours" so that she could collect money to post bail for Father after he was arrested.

¶5    In March 2014, Kimberly's family moved from the apartment in West Jordan to a townhouse in Midvale. By Mother's account, McDaniel went to the townhouse in Midvale "maybe one time" after the family moved.

¶6    In November 2017, when Kimberly was seven years old, Kimberly told Mother that McDaniel had done "some bad things to" her and "touched [her] no-no spot" during the time that they lived "in the apartment with the long stairs." The next day, Mother reported the alleged abuse to police. Mother believed that the abuse had occurred in early 2014 because that was the only period in which Kimberly had been left alone with McDaniel.

¶7    Kimberly was soon interviewed by a detective (Detective) at the Children's Justice Center (CJC). After discussing various innocuous things with her, Detective asked Kimberly if she knew why she was "here today." Kimberly responded that McDaniel had "raped" her. Detective asked Kimberly to tell her "everything about" McDaniel raping her. Kimberly said that during the period when the family lived "in a house with long stairs," McDaniel had "put his mouth on" her "[v]agina." Continuing, Kimberly said that McDaniel had also put "his private part" "on" her mouth "one time" while her clothes were on. Kimberly initially said that McDaniel's clothes were on when he put his private part on her mouth, but she soon corrected herself and said that his pants were off and that he had put his penis "in" her mouth. Kimberly also told Detective that, during this same encounter, McDaniel had gotten "on top of" her on the couch and had "moved up and down" while both of their clothes were on. Kimberly said that she told McDaniel to "stop, but he didn't stop until" she screamed profanities at him.

¶8     After taking a short break, Detective again asked Kimberly about McDaniel putting his mouth on her vagina. The following exchange occurred:

> Kimberly: I probably—he didn't really do that to me because I probably—I probably forgot for a second, but then I remembered, he didn't really do that. For a second, I forgot.
>
> Detective: He didn't do what?
>
> Kimberly: He didn't do the vagina thing. He didn't . . . put his mouth on my—he—I put—he made me put his—he made me put my mouth on his. That's what—the vagina thing didn't really happen. I was probably just thinking about something else for a minute.

¶9     During the interview, Kimberly was asked what had caused her to tell Mother that McDaniel had touched her. Kimberly responded that "one of [her] brother's friends" got "too close to" her and that when she told Mother about that, Mother and Kimberly's grandmother had asked her whether "anything happened to" her. She said that she then told them about the abuse from McDaniel.

¶10    Detective later interviewed McDaniel. There, McDaniel admitted that in 2014, he was "running around, . . . not working, being a bum, [and] using meth." He said that he was "pretty close" friends with Father, that Father "used to deal drugs," and that they used drugs together. McDaniel denied ever staying at Mother and Father's apartment in West Jordan, although he did admit that he sometimes stayed with his daughter who lived in the same apartment complex as Mother and Father. McDaniel denied ever babysitting for Mother and Father, and he specifically denied ever putting his penis in Kimberly's mouth. McDaniel repeatedly insisted that he's "not that way," and he told Detective

that he "didn't do nothing like that" and "[w]ould never do nothing like that." McDaniel said that he didn't "know why anybody would say something like that" about him.

*Charges*

¶11 The State charged McDaniel with two counts of sodomy on a child and one count of aggravated sexual abuse of a child. McDaniel was arrested on these charges, and he remained incarcerated pending trial.

*Pretrial Ruling on Expert Testimony*

¶12 Before trial, the State gave notice of its intent to call an expert witness (State Expert). The State explained that State Expert was a forensic interviewer at the CJC who had conducted hundreds of interviews. The State said that it intended to have State Expert testify about Kimberly's CJC interview, testify as a "[b]lind expert on Child Abuse Accommodation[] and counter-intuitive behavior in children," and offer "[c]ounter-testimony against possible defense experts." As part of the "[b]lind expert" portion of his testimony, the State indicated that State Expert's testimony might include "incidence of stranger versus intimate abuse, delayed disclosure, to whom disclosure is made and the effects of disclosure, age and timing of disclosure, gender and its impact on disclosure, types of disclosure, script memory, episodic memory, the concepts of flight/[fight]/freeze in the context of sexual abuse, the process of victimization, and suggestibility."

¶13 McDaniel moved to exclude State Expert's proposed testimony. McDaniel argued that:

- State Expert was not qualified to testify about "the behaviors of child sex abuse victims" or "childhood memories";

- State Expert's proposed testimony didn't satisfy the foundational requirements of rule 702 of the Utah Rules of Evidence; and

- State Expert's proposed testimony should be excluded under rule 403 of the Utah Rules of Evidence because it would "improperly vouch for [Kimberly's] credibility."

¶14 The district court later denied the motion. The court ruled that State Expert was "qualified to testify to these topics," that the proposed testimony satisfied the "basic foundational showing of indicia of reliability," and that so long as State Expert did not testify "about whether he believes or believed the alleged victim . . . to be credible" or about the "statistical frequency of false accusations," the testimony would not violate rule 403.

*McDaniel Wears Jail Clothing at Trial and Counsel's
Opening Statement*

¶15 During a hearing shortly before trial, McDaniel's counsel (Counsel) informed the court that "we're not going to be dressing Mr. McDaniel up in, you know, formal attire," and he further explained that the defense intended to have McDaniel "remain in jail clothing" during the trial. The district court then spoke to McDaniel directly, advising him that he had the right "to appear in court in civilian clothes and to have it not be apparent to the jury that [he was] in custody." In response to a question from the court, McDaniel agreed that it was his "choice affirmatively to appear in [his] jail clothes with handcuffs."

¶16 In March 2023, the case went to trial. Counsel started the opening statement by saying:

> I was a drug addict for 20 years. I smoked methamphetamine every day. I'm a bum. I sleep in my truck. I'm a petty criminal. I pass bad checks. I'm all those things. But what I'm not is a child abuser.

And when Detective . . . was questioning me, I told her that I was never alone with [Mother] and [Father's] children and I did not sexually abuse their daughter.

Now members of the jury, I've given you kind of a summation of Mike McDaniel. I've given you kind of a summation of who he is and most importantly who he isn't. And when you hear these types of accusations and you hear that a child is making an accusation that an adult harmed them, let's be honest, we all want to believe the child. Particularly when you are talking about a man like Mike McDaniel. Mike McDaniel, based on his appearances, based on who he is, and when you're at the Smith's grocery store shopping with your children, you kind of clutch your children a little bit tighter. When you're riding the TRAX and you see Mike McDaniel sitting down, what you want to do is clutch your children a lot tighter even though you don't know anything about him. Just the way he looks.

Now, members of the jury, in this trial I'm going to ask you to cast that aside and to focus on what you're going to hear and what you observe. And the issue in this case is not Mike McDaniel, but the issue in this case is whether or not you believe his accuser, [Kimberly].

*State's Case*

¶17 The State presented its case through the testimonies of Detective, Kimberly, Mother, the officer who took Mother's report, State Expert, and a medical professional who evaluated Kimberly.

¶18    In her testimony, Detective testified about her interviews of both Kimberly and McDaniel. In conjunction with Detective's testimony, a recording of Kimberly's CJC interview was played for the jury.

¶19    In her testimony, Kimberly—who was now twelve years old—testified that when she was about three or four years old, she lived in a three-bedroom apartment in "West Valley . . . [w]ell, Taylorsville, West Valley, just around there." When asked who she "lived there with," she responded that she lived there with McDaniel, Mother, Father, and her brother.

¶20    Kimberly then testified that, during that time period, McDaniel touched her "chest" and "vagina" when changing her diapers, and she said that when he did so, his hand would linger for "[a] few minutes." Kimberly testified that, sometimes while he was changing her, McDaniel would blow on her vagina and lick it. Kimberly also said that McDaniel touched the "[i]nside" of her vagina with "[h]is penis" on the couch while he laid on top of her and that he moved "[u]p and down." Kimberly said that this happened "three times at most," that she sometimes "would have a shirt on and sometimes [she] wouldn't," and that McDaniel "would normally have a shirt on but not pants."

¶21    Kimberly also said that on some other occasions, McDaniel "locked [her] in the bathroom" and put "[h]is penis" in her mouth. Kimberly said this happened "[p]robably four or five" times.

¶22    Kimberly said that she never told McDaniel to stop abusing her because she "didn't really know what was going on" but that she "did cuss at him a few times . . . when he wouldn't let [her] play with [her] toys." When asked what prompted her to finally disclose the abuse, Kimberly responded that her older cousin taught her what the word "rapist" or "pedophile" meant, that Kimberly told her cousin "that happened to me," and that she told her grandmother and Mother about the abuse "the next day."

¶23    In his testimony, State Expert discussed how forensic interviews of children are conducted. He explained that "it's very important" for interviewers to "remain impartial" and to "conduct themselves in [a] way that is neutral to gather information about allegations of abuse," which can be accomplished "by asking open-ended questions to allow the child to talk about whatever they've experienced or whatever has happened to them in their own words."

¶24    State Expert also testified about children's concept of time, script and episodic memory, fragmented disclosure, reminiscence, and the effects of trauma on memory. State Expert testified that young children's "concept of time is not fully developed" and that children sometimes exhibit "script memory," where they remember multiple or "similar" events as occurring in "kind of a collective." State Expert also testified that children sometimes exhibit "fragmented disclosure," wherein they "may not recall all of the specific details" at a "particular time," instead recalling details in a "somewhat fragmented" form. State Expert further testified that children are susceptible to the phenomenon of "reminiscence," under which they may "recall[] specific details on subsequent times that they're asked about something that's happened to them." And State Expert also testified that a "lot of the research does say that childhood events that are negative are remembered very well."

¶25    Finally, the medical professional testified that she works for a local children's hospital and examines children who are alleged to have been sexually abused. She said that she performed a physical exam of Kimberly in December 2017 and that the physical exam was "normal." But she then added that "a normal exam does not mean that nothing happened." The medical professional also testified that while she was speaking with Kimberly, Kimberly told her that McDaniel had touched her vagina "over" her clothes "once" and that Kimberly had also told

her that McDaniel "made [Kimberly] touch his pee pee with [her] mouth" "once."

*Directed Verdict Motion and Defense Case*

¶26   After the State rested, McDaniel moved for a directed verdict. McDaniel argued that there was "insufficient evidence . . . presented for any reasonable jury to find proof beyond a reasonable doubt." In arguing this motion, McDaniel pointed to various "discrepancies" between Kimberly's accounts of the abuse (including discrepancies between the CJC interview and the account she gave in her trial testimony), and he also pointed to "the fact that she [was] relaying a memory from when she was three years old." After hearing a response from the State, the district court denied the motion, explaining "that the State ha[d] met its burden and that there ha[d] been sufficient evidence presented from which a jury acting reasonably could convict the defendant and that the State ha[d] in fact established a prima facie case against the defendant on each one of the offenses charged."

¶27   In the defense case, McDaniel called his own expert (Defense Expert). Defense Expert testified about problems associated with childhood memories, such as "infantile amnesia," suggestibility, and "source-monitoring errors." Defense Expert explained that "infantile amnesia" is "a phenomenon" wherein a person can remember an experience that happened "during [their] first several years of life" and they "may be able to report it the next day, or maybe even six months later," "[b]ut in two or three years [they] cannot remember it at all." Defense Expert also testified that because young children "can't monitor the source of their memory," they are susceptible to source-monitoring errors, where they think they're remembering what "actually happened" but they're "really remembering what someone has told them about their life experience."

¶28   Like State Expert, Defense Expert opined on children's understanding of time, fragmented disclosure, reminiscence, and

the effects of trauma on memory. Defense Expert testified that it is "difficult" for children to "form[] long-term memories" because "the hippocampus" (or "temporal lobe") is not fully developed "until about age nine or ten." Defense Expert agreed with State Expert that "in child forensic interviews, there's research that says that if you re-interview a child, . . . they're probably going to report more information" "because the child's brain is trying to think more about their experience." Defense Expert also agreed with State Expert that it "is common knowledge" that people "remember traumatic events better than routine events." But Defense Expert disagreed with State Expert on the concept of fragmented disclosure, explaining that there's not "a whole lot of support" for that concept in the literature because "typically when people have gaps in what they experienced, they fill it in with information."

*Jury Instruction and Conviction*

¶29 Before closing arguments, the court read instructions to the jury. These included elements instructions for the charged offenses. As noted, one of the charged offenses was aggravated sexual abuse of a child. One of the elements of that offense is that the actor took "indecent liberties with a child, or cause[d] a child to take indecent liberties with the actor or another." Utah Code § 76-5-404.1(2) (2014). The jury was accordingly instructed that it had to find that McDaniel "took indecent liberties" with Kimberly. It was then given the following instruction that defined indecent liberties:

> "Indecent liberties" means touching a minor child's genitals, anus, buttocks, pubic area, or female breast; causing any part of a minor child's body to touch the actor's or another's genitals, pubic area, anus, buttocks, or female breast; simulating or pretending to engage in sexual intercourse with a minor child, including genital-genital, oral-genital,

anal-genital, or oral-anal intercourse; or causing a minor child to simulate or pretend to engage in sexual intercourse with the actor or another, including genital-genital, oral-genital, anal-genital, or oral-anal intercourse.

¶30 In the defense's closing argument, Counsel again discussed McDaniel's appearance—i.e., that he had appeared in jail clothes. Counsel stated:

Look at Mr. McDaniel. You might have a bias against him simply because of the way he looks. I ask you to set those aside, recognize those biases, and set them aside while you consider the evidence in this case.

I want to talk a little bit about Mike McDaniel first. We could have dressed him up, put him in a suit. But that's not Mr. McDaniel. You heard in his interview, Mr. McDaniel has had a long history of drug abuse, petty crime, and he talked with the police. But that's who Mr. McDaniel is. He owns those facts. He owns what has been a hard life for him.

¶31 Continuing, Counsel acknowledged that McDaniel had been "addicted to drugs." But Counsel then stressed that when Detective asked McDaniel to agree to an interview, even though McDaniel did not initially know that he was being accused of sexual abuse, McDaniel openly admitted to his past drug use. Counsel asked jurors to not let "biases . . . against someone like" McDaniel impact their thinking or "blur [their] judgment."

¶32 After the case was submitted to the jury, the jury convicted McDaniel on all three counts.

## ISSUES AND STANDARDS OF REVIEW

¶33    On appeal, McDaniel first argues that the district court erred in denying his directed verdict motion at the close of the State's case. In his view, Kimberly's testimony was inherently improbable, and without it, there was insufficient evidence to support his convictions. With respect to inherent improbability, "we accord deference to the trial court's ability and opportunity to evaluate credibility and demeanor," and we therefore "review deferentially a trial court's decision to decline to disregard a witness's testimony due to inherent improbability, reversing the trial court's decision only if it was clearly erroneous." *State v. Skinner*, 2020 UT App 3, ¶ 20, 457 P.3d 421 (quotation simplified). With respect to general insufficiency, "we will uphold the trial court's decision if we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* ¶ 19 (quotation simplified).

¶34    McDaniel relatedly argues that it was ineffective assistance or plain error to not revisit the directed verdict motion after Defense Expert testified. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law," and "to prevail on plain error review, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Cesspooch*, 2024 UT App 15, ¶ 7, 544 P.3d 1046 (quotation simplified), *cert. denied*, 550 P.3d 994 (Utah 2024).

¶35    Second, McDaniel argues that the district court erred in denying his motion to exclude State Expert's testimony. "The correct standard of review for a trial court's decision to admit or exclude expert witness testimony is abuse of discretion." *State v.*

*Draper*, 2024 UT App 152, ¶ 35, 560 P.3d 122 (quotation simplified).

¶36 Third, McDaniel argues that Counsel was ineffective for presenting McDaniel in jail clothes and then commenting on McDaniel's appearance in opening statement and closing argument. As noted, "an ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *Cesspooch*, 2024 UT App 15, ¶ 7 (quotation simplified).

¶37 Finally, McDaniel argues that he received ineffective assistance when Counsel did not object to a jury instruction that defined indecent liberties as including simulated sexual intercourse. In the alternative, McDaniel argues that the district court plainly erred in giving that instruction. These standards are provided above. *See supra* ¶ 34.

## ANALYSIS

### I. Directed Verdict Issues

¶38 McDaniel argues that the district court erred in denying his directed verdict motion at the close of the State's case. McDaniel also argues that Counsel provided ineffective assistance by not renewing the directed verdict motion after the defense's case, or, alternatively, that the district court plainly erred by not sua sponte granting a directed verdict at that point.

### A. Directed Verdict Motion at Close of the State's Case

¶39 McDaniel argues that Kimberly's "account was inherently improbable." Without that testimony, he then claims that the court should have granted the directed verdict motion he filed at the close of the State's case. But we disagree with McDaniel's contention that the testimony was inherently improbable. As a result, we see no error in the denial of his motion because there

was some evidence from which the jury could conclude that McDaniel committed the charged offenses.[3]

¶40   "In what's sometimes referred to as a '*Robbins* claim,' a defendant asks the court to disregard a particular witness's testimony as 'inherently improbable' when determining whether there is sufficient evidence for a conviction." *State v. Brown*, 2025 UT App 31, ¶ 25 n.6, 566 P.3d 737 (quotation simplified); *see also State v. Robbins*, 2009 UT 23, ¶¶ 16–19, 210 P.3d 288.

¶41   A *Robbins* claim involves "a two-step analysis." *State v. Jok*, 2021 UT 35, ¶ 30, 493 P.3d 665. "First, the court determines whether the challenged piece of evidence is of such a poor quality that it should be disregarded as evidence," *id.*, and second, the court undertakes a "sufficiency analysis, considering all evidence that has not been excluded from consideration on grounds of inherent improbability," *State v. Mayorga*, 2024 UT App 182, ¶ 28, 561 P.3d 1184, *cert. denied*, 568 P.3d 261 (Utah 2025).

¶42   To convince us that Kimberly's testimony should be disregarded, McDaniel must show that her testimony was "sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that

---

3. The State contends that McDaniel's inherent improbability argument is unpreserved. In response, McDaniel argues that while he did not use the phrase "inherently improbable" (or some variant thereof) in his motion, that motion was in effect an inherent improbability motion because he had made the same substantive arguments, albeit without the extra verbiage. Because the merits of this claim can be resolved in favor of the State, we choose not to address the State's preservation argument. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation." (emphasis in original)).

[McDaniel] committed the crime[s] for which he . . . was convicted." *Jok*, 2021 UT 35, ¶ 29 (quotation simplified). Our supreme court has "identified three factors that merit consideration" under an inherent improbability analysis: "material inconsistencies, patent falsehoods, and lack of corroborating evidence." *Id.* ¶ 32.[4]

¶43 McDaniel's claim is largely focused on various inconsistencies in Kimberly's accounts. These include:

- During the CJC interview, Kimberly initially said that the abuse occurred when she and McDaniel had clothes on but she later claimed that McDaniel touched the inside of her vagina with his penis while his pants were off; at trial, she said that she was sometimes unclothed as well.

- During the CJC interview, Kimberly initially said that McDaniel had put his mouth on her vagina. But after a short break, she retracted that, saying, "He didn't do the vagina thing. He didn't . . . put his mouth on my—he—I put—he made me put his—he made me put my mouth on his. That's what—the vagina thing didn't really happen. I was probably just thinking about something else for a minute."

- During the CJC interview, Kimberly said that she was only abused on one day; at trial, she testified to several instances of abuse that occurred on different occasions.

---

4. The State argues that McDaniel must formulaically show all three of these factors. But our supreme court has clarified that this is not "a strictly factored test," and it has further warned "against inflexible reliance on these factors." *State v. Jok*, 2021 UT 35, ¶ 32, 493 P.3d 665. Instead, in the view of the court, these factors "should be read as examples" of things that "merit consideration" under an inherent improbability analysis." *Id.*

- During the CJC interview, Kimberly said that she screamed profanities at McDaniel to get him to stop; at trial, she testified that she directed profanities at McDaniel when he wouldn't let her play with her toys.

- During the CJC interview, Kimberly said that she disclosed the abuse after one of her brother's friends got too close to her, which prompted Mother and her grandmother to ask if she had been abused; at trial, she said that she disclosed the abuse after her older cousin taught her what "rapist" or "pedophile" meant.

- Kimberly testified that she thought her family lived in the apartment for two or three years and that it had three bedrooms; Mother testified that they lived in the apartment for only four months and that it had just one bedroom.

Separate from these inconsistencies, McDaniel also points out that Defense Expert testified that children could create false memories based on source-monitoring errors. And he further points out that Kimberly's medical exam was "normal," which, in his view, meant that "there was no corroborating evidence." From all this, McDaniel claims that Kimberly's testimony was so improbable that it could not be relied on.

¶44 Even with these problems, however, the State offers several reasons why Kimberly's testimony did not rise to the level of inherent improbability as that concept has been articulated in our cases. We find three of them to be persuasive, particularly when considered together as part of a holistic inherent improbability analysis.

¶45 First, as indicated, the inherent improbability analysis considers whether there were "*material* inconsistencies" in the witness's account. *Id.* (emphasis added). By contrast, "inconsistencies with respect to peripheral issues or details will

generally not implicate the inherent improbability doctrine but are matters for the jury to resolve in assessing the witness's credibility." *State v. Hernandez*, 2024 UT App 127, ¶ 14, 557 P.3d 639 (quotation simplified), *cert. denied*, 561 P.3d 691 (Utah 2024); *see also State v. Broadwater*, 2024 UT App 184, ¶¶ 44–45, 562 P.3d 739 (concluding that a witness's testimony was not inherently improbable where the inconsistencies in question involved "tangential issues that had only indirect relevance to the issue at hand" or "matter[s] of perception about which a person could potentially simply be mistaken"), *cert. denied*, 564 P.3d 959 (Utah 2025).

¶46 Many of the inconsistencies that McDaniel identifies concern peripheral issues or details. These include such things as whether or when Kimberly screamed profanities at McDaniel, what prompted her to disclose the abuse, how long her family lived in the West Jordan apartment, and how many bedrooms that apartment had. Again, the question before the jury was whether McDaniel abused Kimberly. Because many of the inconsistencies that McDaniel points to were tangential and were about the kinds of things that a person could reasonably be mistaken about, we conclude that they provide little (if any) support for McDaniel's assertion that Kimberly's testimony as a whole was inherently improbable.

¶47 Second, Mother corroborated certain aspects of Kimberly's account. At trial, Mother testified that McDaniel "stayed with [them] on and off" for about three months between December 2013 and February 2014; that she would leave her children with McDaniel "[a]t least four times a week" for "up to eight" hours so that she and Father could "run around and collect money"; and that on one occasion after Father had been arrested, Mother left McDaniel alone with the children for "[a]lmost 48 hours" so that she could collect money to post Father's bail. As the State points out, this testimony was important because it corroborated Kimberly's claims about when McDaniel had the "opportunity to

abuse" her. As we've previously acknowledged, "[c]orroborating evidence sufficient to defeat a *Robbins* claim does not have to corroborate the witness's account across the board, in every particular. It just has to provide a second source of evidence for at least some of the details of the witness's story." *State v. Skinner*, 2020 UT App 3, ¶ 34, 457 P.3d 421.

¶48　Finally, the State points to the sensitivity with which Utah courts view the testimonies of child victims. *See, e.g.*, *State v. Virgin*, 2006 UT 29, ¶ 38, 137 P.3d 787 ("We are sensitive to the fact that child sexual abuse cases often rest solely on the testimony of a young child. We also recognize that it is not unusual that a child's testimony be somewhat inconsistent, especially in sexual abuse cases."); *State v. Klenz*, 2018 UT App 201, ¶ 78, 437 P.3d 504 ("Given that it is not unusual for a child to testify somewhat inconsistently, especially in sexual abuse cases, the inconsistencies in [the victim's] testimony could be explained by her age and lack of sophistication." (quotation simplified)). This was true here, where Kimberly was twelve years old at the time of trial and was testifying about events that allegedly occurred when she was three or four.

¶49　To be sure, we recognize that there were some problems with Kimberly's testimony. Kimberly *was* inconsistent about many things—some of them were peripheral, but some of them were about the alleged abuse. And she *was* testifying about events that allegedly occurred many years earlier and while she was very young, which could give a jury some reason to view her testimony with skepticism. We thus acknowledge that the jury could take the various concerns identified by McDaniel into account when it assessed the credibility of Kimberly's testimony, and the defense certainly could—and, indeed, did—ask the jury to disregard her claims during its own arguments at trial. *See, e.g.*, *Jok*, 2021 UT 35, ¶ 28 (noting the jury "serves as the exclusive judge of both the credibility of witnesses and the weight to be given [to] particular evidence" (quotation simplified)); *State v. Prater*, 2017 UT 13, ¶ 39,

392 P.3d 398 ("The question of which version of their stories was more credible is the type of question we routinely require juries to answer.").

¶50   But the inherent improbability analysis asks a court to take testimony *away from* the jury—i.e., to conclude that the testimony in question was so improbable that the jury could not be allowed to consider it. This is a high bar. As we've recently recognized, the inherent improbability standard is not "satisfied where the appellant raises garden-variety credibility questions, such as which witness to believe, or which version of a witness's conflicting account to believe." *In re S.M.*, 2024 UT App 135, ¶ 33, 557 P.3d 649 (quotation simplified). In our view, the problems identified by McDaniel did not satisfy this standard, because "we can find nothing in the record that runs so counter to human experience that it renders the testimony inappropriate for consideration." *Id.* (quotation simplified). The district court therefore correctly concluded that the credibility issues relating to Kimberly's testimony could and should be submitted to the jury, who was best positioned to decide whether she should be believed.

¶51   In light of this conclusion, we see no error in the court's denial of the directed verdict motion that McDaniel filed at the close of the State's case. Again, the question before the court was whether there was "some evidence . . . from which a reasonable jury could find that the elements of the crime[s] had been proven." *Brown*, 2025 UT App 31, ¶ 15 (quotation simplified). At trial, Kimberly testified that when McDaniel was changing her diapers, McDaniel touched her "chest" and "vagina" while his hand lingered for a "few minutes"; that he sometimes blew on and licked her vagina; that McDaniel touched the "[i]nside" of her vagina with "[h]is penis" on the couch while he laid on top of her and moved "[u]p and down"; and that McDaniel "locked [her] in the bathroom" and put "[h]is penis" in her mouth. McDaniel does not argue that this testimony was insufficient to satisfy the

elements of the charged offenses. As a result, based on this testimony, we conclude that the jury could find McDaniel guilty of two counts of sodomy on a child and one count of aggravated sexual abuse of a child. The district court therefore did not err in denying McDaniel's motion for a directed verdict at the close of the State's case.

B.     Renewed Directed Verdict Motion

¶52     After the district court denied McDaniel's directed verdict motion, the defense presented its own case. Of note, Defense Expert testified about problems associated with childhood memories, such as "infantile amnesia," suggestibility, and "source-monitoring errors." In light of this additional testimony, McDaniel argues that Counsel provided ineffective assistance by not making a renewed motion for a directed verdict at the close of the defense's case; in the alternative, McDaniel argues that it was plain error for the court to have not ordered a directed verdict sua sponte. We disagree.

¶53     To prevail on an ineffective assistance claim, a defendant "must establish both deficient performance and prejudice," and "to prevail on plain error review, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Cesspooch*, 2024 UT App 15, ¶¶ 7, 20, 544 P.3d 1046 (quotation simplified), *cert. denied*, 550 P.3d 994 (Utah 2024). As with the earlier motion, a renewed motion would only have succeeded if, "when viewed in the light most favorable to the State, *no evidence existed* from which a reasonable jury could find beyond a reasonable doubt that the defendant committed the crime." *Brown*, 2025 UT App 31, ¶ 15 (emphasis in original, quotation otherwise simplified).

¶54     As noted, Kimberly testified about multiple instances of sexual abuse, and we've now concluded that this testimony was

properly before the jury. Although it's true that Defense Expert testified about certain problems associated with childhood memories, Defense Expert never categorically said that Kimberly's memories were false.[5] Thus, even after Defense Expert's testimony, the jury could have still chosen to believe Kimberly's testimony.

¶55 Because of this, a renewed directed verdict motion would have been futile and cannot support a claim of either ineffective assistance or plain error. *See State v. Perkins*, 2024 UT App 101, ¶ 23, 554 P.3d 363 ("A futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make a motion that would not have been granted, and forgoing such a motion does not prejudice the outcome." (quotation simplified)); *State v. Salgado*, 2018 UT App 139, ¶ 30 n.4, 427 P.3d 1228 (rejecting a defendant's argument that the district court plainly erred by not revisiting a directed verdict motion sua sponte after the defense's evidence was presented, explaining that "[c]onsideration of the conflicting evidence presented by the defense would not alter the analysis, because weighing conflicting evidence and witnesses' credibility is squarely within the province of the jury"). We accordingly reject these claims.

## II. State Expert's Testimony

¶56 McDaniel next argues that the district court abused its discretion in allowing State Expert to testify. McDaniel raises two principal challenges: first, he claims that State Expert "was not qualified to testify about the memory of child abuse victims," and second, he claims that State Expert's testimony was not sufficiently reliable.

---

5. Indeed, as we recently explained in *State v. Francis*, 2025 UT App 104, ¶ 71, -- P.3d --, it would have been impermissible for Defense Expert to have offered such testimony anyway.

A.    Qualifications

¶57    Under rule 702(a) of the Utah Rules of Evidence, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." From both the plain language of this rule and from the cases interpreting it, it is clear "that witnesses can be qualified as experts not only on the basis of formal educational training, but also on the basis of their own personal or vocational experiences." *State v. Rothlisberger*, 2004 UT App 226, ¶ 24, 95 P.3d 1193, *aff'd*, 2006 UT 49, 147 P.3d 1176; *see also State v. Whitchurch*, 2024 UT App 108, ¶ 42, 554 P.3d 1166 ("We have routinely allowed persons to testify as experts based on the totality of their qualifications and experience, and not on licensing or formal standards alone." (quotation simplified)), *cert. denied*, 564 P.3d 960 (Utah 2025).

¶58    In support of his motion below, McDaniel argued that State Expert was not qualified to testify about "the behaviors of child sex abuse victims" or about "childhood memories." On appeal, however, McDaniel concedes that State Expert had "expertise in conducting interviews." For good reason. As noted by the district court, State Expert testified that he "has extensive knowledge of current research and practice methods in the field of forensic interviewing," and State Expert also testified that he had "conducted hundreds of interviews" of child sex abuse victims.

¶59    On appeal, McDaniel narrows his focus, arguing that State Expert was not qualified to testify about "the workings of childhood memories." McDaniel points to an exchange during State Expert's direct examination, wherein he made a number of statements about childhood memories. As emphasized by McDaniel on appeal, these included statements that:

- "[w]ith younger children, their concept of time is not fully developed";

- children sometimes have "script memory," where they remember multiple or "similar" events as occurring in "kind of a collective";

- children sometimes have "fragmented disclosure," wherein they may "recall" information but "may not remember all of the specifics" or "salient details," thus causing them to recall details in a "somewhat fragmented" form;

- children are susceptible to the phenomenon of "reminiscence," under which they may "recall[] specific details on subsequent times that they're asked about something that's happened to them"; and

- a "lot of the research does say that childhood events that are negative are remembered very well."

¶60 In McDaniel's view, State Expert was not qualified to offer this testimony about how children remember events. McDaniel argues that State Expert's admitted "expertise in conducting interviews" did not qualify him to "provide[] scientific explanations for how children's memories work" or discuss issues that, in McDaniel's view, were grounded in child psychology. But the State disagrees. In its view, State Expert's experiences interviewing child sex abuse victims and his resultant familiarity with their common responses, coupled with his training and review of the relevant literature, did qualify him to discuss how children remember such events.

¶61 We need not (and do not) decide whether this testimony went beyond State Expert's qualifications. We instead conclude that, even if the court should have excluded it, any such error was

harmless. *See State v. Green*, 2023 UT 10, ¶ 101, 532 P.3d 930 ("An erroneous decision to admit or exclude evidence cannot result in reversible error unless the error is harmful." (quotation simplified)). This is so for two reasons.

¶62 First, the statements at issue comprised just a small part of State Expert's testimony, and they were not emphasized in any meaningful way by the State. State Expert's testimony spans about 40 pages of transcript, but his statements about memory were all made within a span of just 3 pages. The bulk of State Expert's testimony concerned topics that he was certainly qualified to talk about—primarily the nature of CJC interviews and the common responses of child sex abuse victims within them. Moreover, in the State's closing, the prosecutor did not dwell on State Expert's testimony about childhood memories. Much of that argument was focused on the testimony from the various fact witnesses. And when the prosecutor discussed State Expert's testimony, it was largely about testimony relating to the nature of child interviews. Although the prosecutor did make a few references to State Expert's testimony about memory, the prosecutor did not dwell on or emphasize these statements, and the few references made by the prosecutor discussed State Expert's testimony in conjunction with similar statements made by Defense Expert.

¶63 This leads to our second point, which is that the defense called an expert of its own—Defense Expert—and Defense Expert agreed with many of the statements made by State Expert about childhood memory. Defense Expert testified that "the hippocampus" (or "temporal lobe") is still "developing in children" "until about age nine or ten," which makes it "difficult" for children to "form[] long-term memories." Defense Expert further explained that "from a neurological standpoint, . . . that critical part of our brain, our hippocampus, which is the part that remembers life stories, is still developing," that "the other part that is developing is language," and that "language is really

important because . . . our ability to store memories appear to be no greater than our ability to understand and categorize our experiences using the language that we're hearing." Turning to concepts of reminiscence, Defense Expert agreed that "in child forensic interviews, there's research that says that if you re-interview a child, . . . they're probably going to report more information" "because the child's brain is trying to think more about their experience," but he added that the follow-up interview should take place "right after the first interview" to avoid the risk that the memory "get[s] contaminated." And with respect to trauma, Defense Expert testified, "I think this is common knowledge, we remember traumatic events better than routine events. I mean, that's almost like a common sense."

¶64   This testimony largely tracks statements made by State Expert. Insofar as it does, we see no basis for concluding that McDaniel was prejudiced by the similar statements that State Expert had made earlier on these same points. *See State v. Garcia*, 2024 UT App 38, ¶ 39, 546 P.3d 990 ("[O]ur disinclination to find prejudice when improperly admitted testimony is merely cumulative of other properly admitted evidence is longstanding . . . and, we believe, well founded."), *cert. denied*, 550 P.3d 997 (Utah 2024).

¶65   We do recognize, however, that Defense Expert did not agree with what State Expert said about fragmented disclosure. When asked about this subject, Defense Expert testified that there's not "a whole lot of support" for the concept of "fragmentation with memory" because "typically when people have gaps in what they experienced, they fill it in with information." But in light of all of the other evidence presented at trial, we don't believe that State Expert's statements about fragmented disclosure were so pronounced that, without them, there's a reasonable probability the jury would have acquitted McDaniel on any charge. Again, the jury heard Detective's interview of Kimberly at the CJC, it heard Kimberly testify at trial

about the abuse, it heard Mother testify about McDaniel's opportunity to abuse Kimberly, and it heard Defense Expert testify about source-monitoring errors, and yet the jury still chose to convict McDaniel. In view of the whole evidentiary picture, we don't believe that the few statements from State Expert about fragmented disclosure meaningfully tipped the scales.

¶66 As a result, even if it were true that State Expert's testimony about childhood memories exceeded his qualifications, McDaniel has not persuaded us that State Expert said anything about childhood memories that prejudiced him. We therefore decline to reverse on this basis.[6]

B. Reliability

¶67 McDaniel next argues that the "State failed to show that [State Expert's] methods were reliable." We disagree.

¶68 Under rule 702(b) of the Utah Rules of Evidence, expert testimony is admissible "only if there is a threshold showing that the principles or methods that are underlying in the testimony

---

6. In his opening brief, McDaniel also argued that State Expert's "testimony on memory" violated rule 403 of the Utah Rules of Evidence because it was "substantially more prejudicial than probative." We reject this argument for the same reason we've rejected his similar argument about the lack of qualifications—namely, a lack of prejudice.

We do note that, in his motion below, McDaniel seems to have raised a rule 403 objection to State Expert's testimony more broadly. But the rule 403 argument in McDaniel's opening brief was expressly focused on State Expert's testimony about "memory," and McDaniel did not meaningfully develop a rule 403 argument relating to any other portion of State Expert's testimony. To the extent that McDaniel meant to make such a challenge, we conclude that he has not carried his burden of persuasion.

(1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts." This threshold showing is "satisfied if the underlying principles or methods . . . are generally accepted by the relevant expert community," Utah R. Evid. 702(c), and it "requires only a basic foundational showing of indicia of reliability," *id.* R. 702 original advisory committee's note. "Trial courts perform an important gatekeeping function by screening out unreliable expert testimony and ensuring that only reliable expert testimony will be presented to the jury. To that end, trial courts are granted broad discretion in that role, and we will reverse a trial court's decision only when it exceeds the bounds of reasonability." *Johnson v. Montoya*, 2013 UT App 199, ¶ 8, 308 P.3d 566 (quotation simplified). In making this assessment, district courts "must be careful not to displace the province of the factfinder to weigh the evidence" because "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Majors v. Owens*, 2015 UT App 306, ¶ 13, 365 P.3d 165 (quotation simplified).

¶69　As explained, the bulk of State Expert's testimony was about common behaviors of child sexual abuse victims in their interviews. To the extent that McDaniel is challenging this testimony, we again note that State Expert was testifying based off his own professional experiences of having conducted several hundred such interviews. And our courts have repeatedly held that a properly qualified expert witness can offer experience-based testimony. *See, e.g.*, *Taylor v. University of Utah*, 2020 UT 21, ¶ 40, 466 P.3d 124 (explaining that there is "no special rule regarding experience-based expert testimony"); *State v. Bowdrey*, 2024 UT App 113, ¶¶ 13, 27–28, 555 P.3d 367 (concluding that an officer could draw from his "extensive experience" observing drug transactions to testify, as an expert, about what was "common" in certain kinds of drug transactions), *cert. denied*, 561 P.3d 688 (Utah 2024); *State v. Shepherd*, 2015 UT App 208, ¶¶ 30,

33, 357 P.3d 598 (concluding that an expert could testify about "how sound travels over water" based on his experience as an officer in the Coast Guard and as a boating officer at Lake Powell); *State v. Turner*, 2012 UT App 189, ¶¶ 21, 24, 283 P.3d 527 (concluding that a trooper could testify about Intoxilyzer results based on "his experience maintaining Intoxilyzer machines for three years, including calibration to ensure accurate results"). As we explained in *Shepherd*, for example, because the expert there was offering "experiential opinions," he did not need to "identify a particular methodology" but could instead testify based on his professional "experiences" and offer "opinions" that were "within the scope of his experience." 2015 UT App 208, ¶¶ 34–35 (quotation simplified). Thus, to the extent that State Expert was testifying based off his observations and experiences, he did not need to identify a particular methodology, and the district court acted within its discretion in concluding that the testimony could go to the jury.

¶70 To the extent that McDaniel is also challenging the reliability of State Expert's testimony about concepts relating to childhood memory, we reject this claim for the same reason we rejected the similar argument about State Expert's qualifications—lack of prejudice. As discussed, many of the topics from State Expert's testimony about memory that McDaniel points to as being problematic were also discussed by Defense Expert. And while McDaniel has pointed to one area in which the two experts disagreed—namely, fragmented disclosure—we do not think that this testimony alone prejudiced McDaniel. We accordingly see no basis for concluding that any reliability problems associated with this testimony prejudiced McDaniel in any meaningful way.

### III. Jail Clothes

¶71 McDaniel next argues that Counsel was ineffective for presenting him in jail clothes and then commenting on those

clothes during the opening statement and the closing argument. In McDaniel's view, this decision "invit[ed] unfair prejudice based on [his] appearance."

¶72 As noted, to prevail on an ineffective assistance claim, McDaniel must show that Counsel's performance was deficient and that the deficient performance prejudiced the defense. *Cesspooch*, 2024 UT App 15, ¶ 20. McDaniel "must establish both prongs," so "if either is lacking, the claim fails and this court need not address the other." *State v. Ames*, 2024 UT App 30, ¶ 17, 546 P.3d 356 (quotation simplified), *cert. denied*, 550 P.3d 993 (Utah 2024). To establish deficient performance, McDaniel must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (quotation simplified). "The question of deficient performance is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Florreich*, 2024 UT App 9, ¶ 27, 543 P.3d 795 (quotation simplified), *cert. denied*, 547 P.3d 828 (Utah 2024). "The focus of this inquiry is reasonableness, and we judge the reasonableness of counsel's challenged conduct, viewed as of the time of counsel's conduct." *Ames*, 2024 UT App 30, ¶ 18 (quotation simplified).

¶73 McDaniel's argument relies heavily on *Chess v. Smith*, 617 P.2d 341 (Utah 1980). There, our supreme court recognized "[t]he prejudicial effect that flows from a defendant's appearing before a jury in identifiable prison garb," and the court accordingly held that "a trial judge should on his [or her] own initiative inquire of a defendant whether" the defendant wishes to waive the "right not to appear in prison clothes so that the record affirmatively shows an intelligent and conscious waiver by the defendant if the defendant chooses to stand trial in prison clothes." *Id.* at 344–45.

¶74 McDaniel focuses heavily on *Chess*'s recognition of the prejudice that can come from a defendant appearing before a jury in jail clothes. But for purposes of McDaniel's ineffective assistance claim, we think it just as significant that *Chess* recognized that a defendant can waive the right to not appear in jail clothes in front of the jury. *See id.* at 345. And we also think it's significant that McDaniel is not challenging the validity of his waiver but is instead only challenging Counsel's decisions to advise him to do so and then comment on it in front of the jury. Against that backdrop, and in light of the whole record, we don't believe that McDaniel has carried his burden of showing that Counsel's approach was objectively unreasonable.

¶75 At the time that Counsel made these strategic decisions, Counsel knew about the statements McDaniel had made to Detective in his interview. As noted, McDaniel had admitted that in 2014, he was "running around, . . . not working, being a bum, [and] using meth," that he was "pretty close" friends with Father (who was a known drug dealer), and that he had used drugs with Father. Counsel also knew that, during that same interview, McDaniel denied ever abusing Kimberly and that he had repeatedly stated, "I'm not that way."

¶76 McDaniel hasn't argued on appeal that there was any way that the jury would not hear about Detective's interview with McDaniel. And from the record, it seems clear enough that Counsel made a conscious choice to not hide from the interview but to instead lean into it and try using it to McDaniel's advantage. This was evident in the way that Counsel presented his opening statement and closing argument, where he used the interview as something of a thematic anchor. In his opening statement, Counsel noted that, in the interview, McDaniel had admitted to having a drug problem and even being "a petty criminal." But Counsel then sought to draw a contrast with the fact that, during this interview, McDaniel also emphatically denied abusing Kimberly. Counsel thus argued that this showed

that McDaniel was willing to take responsibility for his actions and to own his mistakes, which Counsel suggested should enhance the credibility of McDaniel's denials.

¶77 Counsel returned to this theme in his closing argument. There, he said,

> I want to talk a little bit about Mike McDaniel first. We could have dressed him up, put him in a suit. But that's not Mr. McDaniel. You heard in his interview, Mr. McDaniel has had a long history of drug abuse, petty crime, and he talked with the police. But that's who Mr. McDaniel is. He owns those facts. He owns what has been a hard life for him.

From these arguments, it's clear that Counsel made a conscious and deliberate choice to try using McDaniel's interview—and, indeed, even his criminal past—to the defense's advantage.

¶78 In past cases, we've recognized that defense attorneys sometimes have to make difficult choices about how to deal with unfavorable evidence. *See State v. Rivera*, 2022 UT App 44, ¶ 38, 509 P.3d 257 ("The calculations of counsel in weighing the pros and cons of one strategy over another are, in essence, a judgment about what is most likely to work to the client's benefit in a complex trial process that requires that many choices be made." (quotation simplified)); *State v. Garcia*, 2017 UT App 200, ¶ 23, 407 P.3d 1061 ("After all, an attorney must play the hand he or she is dealt, and an attorney's decision about how to deal with adverse facts is the sort of thing that courts should not second-guess in the context of ineffective assistance claims."). And we recognize that the approach chosen by Counsel in this case was perhaps unusual and unorthodox. As we've acknowledged in other cases, we think it's "perhaps true that not every attorney would have chosen this strategy." *State v. King*, 2024 UT App 151, ¶ 30, 559 P.3d 96.

¶79 But as recognized by the Supreme Court, there "are countless ways to provide effective assistance," and "even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689 (quotation simplified). Under the *Strickland* standard, the question before us is not whether this was, in hindsight, the best approach, but instead "whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *Florreich*, 2024 UT App 9, ¶ 27 (quotation simplified). Under that framework, we are not persuaded that the strategic approach chosen by Counsel was so unreasonable that it constituted deficient performance. McDaniel's ineffective assistance claim accordingly fails.

## IV. Indecent Liberties Instruction

¶80 As noted, one of the charges was for aggravated sexual abuse of a child. Under the version of the statute in effect at the time of McDaniel's conduct, a person was guilty of aggravated sexual abuse if the person touched "the anus, buttocks, or genitalia of any child, the breast of a female child," or otherwise took "indecent liberties with a child, or cause[d] a child to take indecent liberties with the actor or another with intent to cause substantial emotional or bodily pain to any person or with the intent to arouse or gratify the sexual desire of any person regardless of the sex of any participant." Utah Code § 76-5-404.1(2) (2014). At the time of McDaniel's alleged conduct in 2014, the phrase "indecent liberties" was not statutorily defined. But Utah's courts had interpreted that phrase as meaning "activities of the same magnitude of gravity as that specifically described in the statute," i.e., "touching the vagina, anus, buttocks, or breasts." *State v. Lewis*, 2014 UT App 241, ¶ 11, 337 P.3d 1053 (quotation simplified); *accord In re J.L.S.*, 610 P.2d 1294, 1296 (Utah 1980); *State v. Balfour*, 2008 UT App 410, ¶ 15, 198 P.3d 471.

¶81 The instruction that the court gave to the jury defined the phrase in a slightly different way. Of note for this appeal, that instruction included language about the touching of various body parts, and it also included "simulating or pretending to engage in sexual intercourse with a minor child, including genital-genital, oral-genital, anal-genital, or oral-anal intercourse; or causing a minor child to simulate or pretend to engage in sexual intercourse with the actor or another, including genital-genital, oral-genital, anal-genital, or oral-anal intercourse." On appeal, the parties have suggested—and we have no reason to dispute—that the court drew the instruction from a 2018 statutory amendment that added similar language to the definition of indecent liberties. *See* Utah Code § 76-5-416(3) (2018).[7]

¶82 On appeal, McDaniel argues that it was error to instruct the jury "using a definition that was adopted after the dates charged in the information." In his view, the use of this definition essentially amounted to an unconstitutional ex post facto law because it "alter[ed] an element of the offense and lower[ed] the State's burden to convict." And he argues that the inclusion of simulated sexual intercourse was inconsistent with the law that should have governed his case, arguing that a "jury could reasonably find that simulated sexual intercourse . . . is not as serious as touching a listed body part." Although this claim is unpreserved, McDaniel argues that Counsel provided ineffective assistance for not objecting to the instruction on this basis, and he likewise argues that the district court plainly erred by giving it.

---

7. Although the location of the indecent liberties definition has changed in the most recent version of the Utah Code, it still includes "simulating or pretending to engage in sexual intercourse with another individual, including genital-genital, oral-genital, anal-genital, or oral-anal intercourse." Utah Code § 76-5-401.1(1)(a)(i)(C).

¶83 To establish either ineffective assistance or plain error, McDaniel must show prejudice. *See State v. Popp*, 2019 UT App 173, ¶ 40, 453 P.3d 657 (explaining that "the prejudice test is the same whether under the claim of ineffective assistance or plain error" (quotation simplified)). This requires a showing that there is "a reasonable probability that," but for the error in question, "the result of the trial would have been different." *Id.* ¶ 58 (quotation simplified). And "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* ¶ 29 (quotation simplified). Here, we reject both of McDaniel's claims for lack of prejudice.

¶84 In cases that would have been controlling at the time of McDaniel's conduct, we had held that the question of whether a defendant had taken "indecent liberties" with another "was not simply a matter of whether he had touched an enumerated body part of the victim," *State v. Peters*, 796 P.2d 708, 711 (Utah Ct. App. 1990), but that a fact-finder could also consider "the totality of the facts," *Balfour*, 2008 UT App 410, ¶ 16. Here, it's true that Kimberly described something that could be interpreted as simulated sexual intercourse. In the CJC interview, she told Detective that McDaniel had gotten "on top of" her on the couch and had "moved up and down" while both of their clothes were on. And at trial, she again said that McDaniel had laid on top of her on the couch and moved "[u]p and down." It's also true that, in closing argument, the prosecutor argued that this act was the basis for the aggravated sexual abuse charge. But even so, we reject McDaniel's claim for two reasons.

¶85 First, in her trial testimony about this act, Kimberly testified that McDaniel touched the "[i]nside" of her vagina with "[h]is penis" on the couch while he would lay on top of her and move up and down. During this exchange at trial, the prosecutor used the words "touch," "penis," and "vagina" in several questions, and in each of her responses, Kimberly repeatedly agreed that such "touching" had occurred. So although Kimberly

described what could be referred to as simulated sexual intercourse, the simulated sexual intercourse that she testified about involved skin-to-skin touching of her vagina and McDaniel's penis, which was of the "same magnitude of gravity as that specifically described in the statute." *Lewis*, 2014 UT App 241, ¶ 11 (quotation simplified). As a result, it would have qualified as "indecent liberties" under the interpretation of that phrase that governed at the time. Thus, to the extent that the jury believed this testimony—a conclusion that seems consistent with its ultimate verdict—that testimony would have supported the finding that McDaniel had taken indecent liberties under the then-applicable definition.

¶86 Second, it's theoretically possible that the jury was instead inclined to only credit Kimberly's CJC account—where, as noted, Kimberly said that their clothes were on. But even if that were so, we still don't see a reasonable probability that the outcome at trial would have been different. In a case interpreting the prior standard that pre-existed McDaniel's charged conduct, we had held that touching a specified body part over clothing could still qualify as indecent liberties. *See State v. Jacobs*, 2006 UT App 356, ¶ 9, 144 P.3d 226. We explained that, "absent . . . direction" from the legislature to the contrary, "the ordinary and accepted meaning of touching probably includes contact that occurs over clothing." *Id.* ¶ 6. And we then held that for purposes of an indecent liberties element, over-the-clothes touching could suffice if, "considering all the surrounding circumstances," the touching seemed "comparable to the touching that is specifically prohibited" and was thus akin to "sexual misconduct." *Id.* ¶ 9 (quotation simplified); *see also State v. Peters*, 796 P.2d 708, 710–11 (Utah Ct. App. 1990). We reiterated that conclusion in another case a few years later that interpreted the same language. *See State v. Carrell*, 2018 UT App 21, ¶ 56, 414 P.3d 1030.

¶87 Here, Kimberly said in her CJC interview that in an encounter that occurred while she was three years old, McDaniel

had gotten "on top of" her on the couch and had "moved up and down." She also said that in the same encounter, McDaniel put his penis "in" her mouth. Even focusing on the movements on the couch, a jury could conclude that this act involved over-the-clothes touching of the relevant body parts and that it therefore constituted indecent liberties. Moreover, even if the jury's conclusion wasn't grounded that granularly in over-the-clothes touching of the relevant body parts, we also think that the jury could find that the act in question was still of the "same magnitude of gravity" as touching the unclothed body parts. *Lewis*, 2014 UT App 241, ¶ 11 (quotation simplified). After all, the statute at the time did not include simulated sexual intercourse under the rubric of indecent liberties, but McDaniel has not pointed us to any controlling authority from that time that prohibited the jury from finding that such an act qualified. And the act that Kimberly described was not in any way benign. Rather, it was an overtly sexual act of simulated sexual intercourse with a three year old on a couch during an encounter that also included oral sex.

¶88   Again, because this claim is unpreserved, McDaniel must persuade us that there is a reasonable probability that, but for this instructional error, the result at trial would have been different. For the reasons set forth above, we're not persuaded that there is a reasonable probability that the jury would have reached a different conclusion without the error in question. For these reasons, we reject this claim for lack of prejudice.[8]

---

8. Finally, McDaniel argues that the cumulative effect of the alleged errors prejudiced him. "Under the cumulative error doctrine, we apply the standard of review applicable to each underlying claim of error and reverse only if the cumulative effect of multiple errors undermines our confidence that a fair trial was

(continued…)

CONCLUSION

¶89 For the foregoing reasons, we affirm McDaniel's convictions.

———————

had." *State v. Johnson*, 2016 UT App 223, ¶ 15, 387 P.3d 1048 (quotation simplified).

Here, we've assumed without deciding that State Expert should not have been allowed to testify about childhood memory issues. But as noted, much of his testimony about those issues overlapped with unchallenged testimony offered by Defense Expert, and we don't believe that the small part of State Expert's testimony that differed from Defense Expert's testimony was significant enough to tip the evidentiary scales in a meaningful way. And while we've also assumed that the court erred by giving an indecent liberties instruction that was not supported by the then-controlling law, we see no basis for concluding that this error prejudiced McDaniel, given that Kimberly's accounts would have supported a conviction under then-controlling law. Thus, even considering these assumed errors together, our confidence in this verdict is not undermined.